**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

EMILY LYNCH,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, BING REAVES, LYNN MAZURKIEWICZ, as executor of the estate of ANTHONY MAZURKIEWICZ, deceased, MICHAEL DIPAOLA, HENRY FAVOR, NASER ZENELOVIC, RAYMOND DEARCOP, RALPH MONTINARELLI, JOSEPH MORABITO, SAMUEL LUCYSHYN, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,

Defendants.

21-cv-6708 (FPG)(MJP)

**SECOND AMENDED**
**COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

I.   <u>**PARTIES**</u>

1.      Plaintiff EMILY LYNCH (she/her) is a resident of the City of Rochester, State of New York.

2.      Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.      Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      BING REAVES, MICHAEL DIPAOLA, and "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.      Defendant LYNN MAZURKIEWICZ, as administrator of the estate of RPD Officer ANTHONY MAZURKIEWICZ ("decedent" or "MAZURKIEWICZ"), is sued in her individual capacity. Officer MAZURKIEWICZ was at all times relevant to this complaint a Police Officer with the RPD. At all relevant times, MAZURKIEWICZ was acting within the scope of his employment with the CITY and RPD and under color of state law.

6.      Defendant HENRY C. FAVOR ("FAVOR") was, at all times relevant herein, Commander of the Special Operations Division ("SOD") of the RPD. In that role, he oversaw the Mobile Field Force ("MFF"). In his capacity as Commander of the SOD, he was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant FAVOR was responsible for enforcing the rules of the MFF and

2

ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

7.      Defendant NASER ZENELOVIC ("ZENELOVIC"), was, at all times relevant herein, a Captain with the RPD. Defendant Zenelovic is sued in his individual capacity. Zenelovic was one of the Incident Commanders on September 4, 2020.

8.      Defendant RAYMOND W. DEARCOP ("DEARCOP") is the Commander of the Special Operations Section ("SOS") of the RPD. At all relevant times herein, he was a Captain with the RPD assigned to the SOD. On September 4, 2020, DEARCOP was one of the Incident Commanders on on the scene. On September 5, 2020, DEARCOP was the Deputy Incident Commander on the scene. As commander of the SOS, he oversaw the MFF and all its personnel and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant DEARCOP was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

9.      Defendant RALPH MONTINARELLI ("MONTINARELLI"), at all relevant times herein, was a Lieutenant assigned to the SOC and the Tactical Unit ("TACT") of the RPD. Montinarelli was one of the Incident Commanders on September 4, 2020. Montinarelli was the Field Force Commander on September 5, 2020, where he oversaw all Mobile Field Force members on the ground. Defendant RALPH MONTINARELLI is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Montinarelli is sued in his individual capacity.

10.      Defendant JOSEPH MORABITO is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law.

Defendant Morabito is sued in his individual capacity. Morabito was the Incident Commander on September 5, 2020.

11.     Defendant SAMUEL LUCYSHYN is or was at all relevant times a Lieutenant with the RPD and acting within the scope of his employment and under color of law. At all relevant times herein, LUCYSHYN was the Grenadier Team Leader. The Grenadier Team is a component of the MFF, comprised of selected members who are trained to deploy chemical munitions, and to utilize other crowd dispersal technology and techniques. As Grenadier Team Leader, Defendant LUCYSHYN oversaw the Grenadier Team and was responsible for all Grenadier Team matters, including the selection, ordering, purchase, and inventory of all chemical weapons and/or "less lethal" weapons used by the Grenadier Team; and the appointment, training, supervision and conduct of Grenadier Team personnel. In addition, Defendant LUCYSHYN was responsible for enforcing the rules of the Grenadier Team and ensuring that Grenadier Team personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

12.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

13.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant

BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

14.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

15.     BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION AND CONDITIONS PRECEDENT

16.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

17.     The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

18.     Ms. LYNCH filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

19.     The CITY and County waived a 50-h hearing for Ms. LYNCH.

20.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

21.     This action is being brought within a year of the event that gives rise to Ms.

LYNCH causes of action under New York State law and Plaintiff has complied with all of the

statutory prerequisites for bringing this action.

### III.  STATEMENT OF FACTS

**A.  Facts Common to All Causes of Action.**

22.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police

Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call

for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an

RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the

scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared

brain dead that night; he was taken off life support and died on March 30.

23.     When the video of RPD Officers killing Daniel Prude was finally made public on

September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to

mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing

practices, and call for new visions of public safety that value Black lives.

24.     On September 2-6, 2020, the defendants responded to peaceful protests with

extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter

blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly

"less-than-lethal" munitions.

**Friday September 4 to Saturday September 5, 2020**

25.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge

to "kettle" protesters, spray them with tear gas, and attack them with pepper balls—a scene

tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the

Edmund Pettus Bridge in Selma, Alabama. Videos from that night show heavily armored phalanxes of police using pepper balls, 40mm kinetic bullets, tear gas, and batons to assault diverse groups of protesters outfitted only with umbrellas, cardboard boxes, and plastic children's sleds against the Defendants' military-grade arsenal but who nevertheless assembled to protest for racial justice and reformed policing.

26.     RPD officers first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the Public Safety Building ("PSB") and directed them onto the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

27.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

28.     Suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters. In fact, the RPD Officers began indiscriminately firing pepper balls into the crowd less than 30 seconds after the first "dispersal" order was issued at approximately 10:43 p.m

29.     Ms. LYNCH was present near the "front line" of protesters, and it was physically impossible for her to immediately comply and disperse from the bridge.

30.     Ms. LYNCH was shot with one or more pepper balls, without cause or justification.

31.     At approximately 10:47 p.m., Ms. LYNCH was violently seized, thrown to the ground and handcuffed and arrested by REAVES, MAZURKIEWICZ, DIPAOLA and other RPD officers.

32.     DIPAOLA violently shoved and struck Ms. LYNCH, and threw her to the ground, without cause or justification.

33.     DIPAOLA failed to complete a Subject Resistance Report documenting the force used against Ms. LYNCH, in violation of RPD policy.

34.     MAZURKIEWICZ hit Ms. LYNCH with a baton and threw her to the ground, without cause or justification.

35.     MAZURKIEWICZ and/or other RPD officers hit Ms. LYNCH in the face with a baton, without cause or justification.

36.     MAZURKIEWICZ failed to complete a Subject Resistance Report documenting the force used against Ms. LYNCH, in violation of RPD policy.

37.     REAVES failed to complete a Subject Resistance Report documenting the force used against Ms. LYNCH, in violation of RPD policy.

38.     REAVES failed to activate his Body Worn Camera to capture the force he used against Ms. LYNCH, in violation of RPD policy.

39.     At no time did Ms. LYNCH commit any crime or violation.

40.     REAVES and other RPD officers lacked cause or any lawful basis to use force against Ms. LYNCH.

41.     REAVES and other RPD officers escorted Ms. LYNCH to the PSB, where she was detained for approximately four hours.

42.     While at PSB, REAVES fabricated his account of his interaction in official police paperwork and falsely accused Ms. LYNCH of committing a crime and forwarded the official police paperwork to the District Attorney to initiate her malicious prosecution.

43.     After approximately four hours, Ms. LYNCH was placed into a police van, driven to a street corner in downtown Rochester near the bus terminal, then released from the van and told "good luck getting home."

44.     The criminal court judge granted Ms. LYNCH's motion to dismiss all the false criminal charges on April 8, 2021.

45.     The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 4-5, 2020 were, upon information and belief, Defendants FAVOR, ZENELOVIC, MONTINARELLI and DEARCOP.

46.     Additionally, LUCYSHYN was on the ground on September 4-5, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio. Lucyshyn also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

47.     Upon information and belief, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 4-5, 2020.

48.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP, along with other City policymakers, devised the plan to erect metal barricades on the West Side of the Court Street Bridge, knowing this would cause protesters to become trapped on the bridge with no method to safely escape or comply with police orders to disperse.

49.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs and CS gas at protesters who were trapped on the bridge, and then to charge at protesters and push and strike them with batons.

50.     After the protest on the night of September 4-5, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

51.     As a result of the chemical weapons Defendants used against her on September 4, 2020, Ms. LYNCH sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

52.     Ms. LYNCH also sustained physical pain from being shot with pepper balls, and emotional and psychological harm from being attacked and falsely arrested by the RPD officers.

**Saturday, September 5, 2020 to Sunday September 6, 2020**

53.     On the night of Saturday September 5, 2020, RPD officers and Sheriff's deputies again used military grade weapons to attack peaceful protesters in downtown Rochester. RPD officers and Sheriff's deputies trapped peaceful protesters at the intersection of Broad Street and Exchange Boulevard, and almost immediately began attacking them. RPD officers and Sheriff's deputies began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.

54.     At approximately 10:20 p.m., the RPD Officers and Sheriff's Deputies kettled and trapped Ms. LYNCH and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

55.     Ms. LYNCH was present near the "front line" of protesters, closest to the police barricades, when the RPD officers issued dispersal orders, knowing that it was physically impossible for Ms. LYNCH and the other protesters to immediately comply and leave the area.

56.     The John Doe RPD Officers and Richard Roe Sheriff's Deputies attacked Ms. LYNCH and the other protesters with chemical weapons, flash bang grenades and other "less lethal" weapons.

57.     The RPD Officers shot Ms. LYNCH many times with pepper balls.

58.     A RPD Officer and/or Sheriff's Deputy threw a tear gas cannister at Ms. LYNCH, which engulfed her in tear gas.

59.     The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 5-6, 2020 were, upon information and belief, Defendants FAVOR, MORABIDO, MONTINARELLI and DEARCOP.

60.     Additionally, LUCYSHYN was on the ground on September 5-6, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio. LUCYSHYN also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

61.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 5-6, 2020.

62.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, devised the plan to erect metal barricades at the intersection of Exchange Boulevard and Broad Street, knowing this would cause protesters to become trapped at this intersection with no method to safely escape or comply with police orders to disperse.

11

63.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs, CS gas, and other chemical weapons and "less lethal" weapons at protesters who were trapped at the intersection of Broad Street and Exchange Boulevard, and then to charge at protesters and push and strike them with batons.

64.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered the use of tactics, chemical weapons and other "less lethal" weapons against "groups" of protesters in an indiscriminate manner.

65.     After the protest on the night of September 5-6, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

66.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. LYNCH sustained irritation to their skin, eyes, mouth, nose and lungs and menstrual irregularities.

67.     Ms. LYNCH also sustained pain, bruising and swelling from being shot with pepper balls and emotional and psychological harm from being attacked by the John Doe RPD officers and Richard Roe Sheriff's Deputies.

   B.   **The Effects of Teargas and Other Chemical Weapons Was Known Prior to the September 2020 Protests**.

68.     After George Floyd was murdered on May 25, 2020, racial justice protests took place in cities across the county. Numerous police departments responded by using teargas and other chemical weapons against protesters.

69.     Immediately, protesters across the country reported that exposure to teargas and other chemical weapons caused menstrual irregularities.

70.     Throughout the summer of 2020, media outlets nationwide reported that protesters who were exposed to teargas and other chemical weapons were experiencing irregularities with their menstrual cycle. *See, e.g.*, Katie C. Reilly, *Police tear gas George Floyd protests despite proof it's dangerous. Time for a ban*, NBC News (June 11, 2020), https://www.nbcnews.com/think/opinion/police-tear-gas-george-floyd-protests-despite-proof-it-s-ncna1229516 (noting that, tear gas "has been linked to miscarriages"); Jennifer Gerson, *Doctors Explain What You Should Know About Tear Gas & Your Period,* Bustle (June 17, 2020), https://www.bustle.com/p/can-tear-gas-affect-your-period-doctors-explain-what-to-know-22987529; Nicole Wetsman, *There isn't enough research to know if tear gas causes early periods: it's dangerous regardless*, The Verge (June 22, 2020), https://www.theverge.com/2020/6/22/21295159/tear-gas-menstrual-cycle-miscarriage-period-protests; Dhruvi Chauhan, Paula Kibuka Musoke, and Goleen Samari, *Using tear gas on protesters perpetuates patterns of reproductive harm*, The Hill (June 26, 2020), https://thehill.com/opinion/healthcare/504699-using-tear-gas-on-protesters-perpetuates-patterns-of-reproductive-harm; Cecilia Nowell, *Protesters Say Tear Gas Caused Them to Get Their Period Multiple Times in a Month*, Teen Vogue (July 2, 2020), https://www.teenvogue.com/story/protestors-say-tear-gas-caused-early-menstruation; Alexandria Herr, Can tear gas mess with your period? Grist (Jul. 17, 2020), https://grist.org/justice/can-tear-gas-mess-with-your-period/; Rebecca Ellis, *'It's like they're testing it on us': Portland protesters say tear gas has caused irregularities with their periods*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/tear-gas-period-menstrual-cycle-portland/. *Police are*

*using tear gas, but lack of study and oversight raises health concerns,* Associated Press (Aug. 6, 2020), https://www.oregonlive.com/news/2020/08/police-are-using-tear-gas-but-lack-of-study-and-oversight-raises-health-concerns.html; Abe Asher, *Irregular Periods and Horrible Headaches: How Tear Gas Is Making Portland Sick*, VICE (Aug. 14, 2020), https://www.vice.com/en/article/4ay5mn/an-endless-barrage-of-tear-gas-is-making-portland-sick; Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and Messed Up Periods?* Marie Claire (Aug. 21, 2020), https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/.

71.     Thus, for months prior to the September 2020 protests, Defendants had clear notice that the use of teargas and other chemical weapons causes damage to women's reproductive health, including menstrual irregularities and miscarriages.

72.     Defendant LUCYSHYN chose various chemical weapons that were used on plaintiff and other protesters. The chemical weapons he chose contained toxic chemicals such as lead, which is known to cause birth defects and reproductive harms.

73.     In fact, many of the various products that Defendant LUCYSHYN chose to use against Plaintiff and other protesters in September 2020 had a warning directly on the product and on the product's website that states:

> "**WARNING: This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer, and Lead Salts, which are known to the State of California to cause birth defects.**

74.     Nevertheless, Defendant LUCYSHYN ignored these warnings and used these chemical weapons, despite having actual knowledge that they could cause birth defects and other reproductive harms.

75.     Defendants ignored these warnings and decided to attack Plaintiff and other protesters with tear gas and other chemical weapons.

### C. **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

76.     For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released.

77.     From the very beginning, the City and RPD officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. City and RPD officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

78.     This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

79.     During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using

overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

80.     The violations of Ms. LYNCH'S rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

81.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

82.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

83.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

84.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

85.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and

focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

86.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Ms. LYNCH.

87.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

88.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

89.     For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

90.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

91.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were

both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

92.     Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

93.     In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

94.     When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

95.     The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2–6, 2020.

96.     The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and

grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on

use for force. There appears to have been no consideration given to whether such force would be

excessive to secure compliance with traffic laws or enforce violations or misdemeanors against

nonviolent protestors.

97.      In summary, upon information and belief, the RPD's exclusive focus on deterring,

dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to

train on specific, relevant aspects of constitutional policing of protests, let alone how to

encourage or facilitate protests—despite having received clear notice that RPD policing of

protests has caused the systemic violations of protesters' constitutional rights for years—

demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and

lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth

Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the

City's negligence, Plaintiff was injured and harmed, as described herein.

> D.   **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

98.      Upon information and belief, for months before the body worn camera video of

RPD officers brutally killing Daniel Prude was released, the COUNTY and BAXTER

coordinated with the CITY and RPD to prepare for and plan their coordinated response to the

anticipated large-scale protests when the video was eventually released.

99.      From the very beginning, the BAXTER and other COUNTY officials zeroed in

on the fact that, unlike other protests, these were focused directly on police misconduct and

racism. Like the City and RPD officials, BAXTER and other COUNTY officials at the highest

levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

100.    This manifested in the training of their Sheriff's Deputies, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their Sheriff's Deputies was clear: there is no such thing as a peaceful protestor.

101.    Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD coordinated with the COUNTY and BAXTER to develop a coordinated protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing

102.    Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

103.    The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities

21

constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

104.   The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

105.   Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

106.   Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

107.   Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

108.   Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

109.   According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and

the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

110.   Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

111.   Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

112.   Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

113.   Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

114.   In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation,

we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

115.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

116.    As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*

117.    All preceding and subsequent paragraphs are incorporated by reference.

118.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

24

119.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## SECOND CLAIM FOR RELIEF

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests***
**(Against the COUNTY and BAXTER)**

120.   All preceding and subsequent paragraphs are incorporated by reference.

121.   All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

122.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## THIRD CLAIM FOR RELIEF
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***

123.   All preceding and subsequent paragraphs are incorporated by reference.

124.   Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

125.   Defendants used force against Ms. LYNCH that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

126.   It was objectively unreasonable for the REAVES, MAZURKIEWICZ, DIPAOLA and other RPD Officers to shoot Plaintiff with  pepper balls, seize her, throw her to the ground, and strike her in the face on September 4, 2020.

127.   It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. LYNCH on September 4 and September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. LYNCH based on her own individual conduct, instead of any perceived "group conduct."

128.   The force used against Ms. LYNCH constitutes a seizure under the 4th Amendment.

129.   The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training.

130.   As a result of the acts and omissions of the RPD officers, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

131.   The actions of the RPD officers were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

132.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## FOURTH CLAIM FOR RELIEF
**Assault and Battery**
*Pursuant to New York State Law*

133.    All preceding and subsequent paragraphs are incorporated by reference.

134.    RPD officers battered Ms. LYNCH by subjecting her to various chemical weapons.

135.    On September 4, 2020, REAVES, MAZURKIEWICZ, DIPAOLA and other RPD officers shot Ms. LYNCH with pepper balls, then violently seized her, threw her to the ground, and struck her with a baton in the face.

136.    On September 5, 2020, RPD officers and/or Sheriff's Deputies assaulted and battered Ms. LYNCH by striking her with various chemical weapons.

137.    Ms. LYNCH was not threatening the law enforcement officers or any other person at any time.

138.    Ms. LYNCH was not committing any crime or violation.

139.    RPD Officers and/or Sheriff's Deputies used military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. LYNCH on September 4, 2020 and September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. LYNCH based on her own individual conduct, instead of any perceived "group conduct."

140.    By the aforedescribed conduct, Defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. LYNCH, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

141.     The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

142.     The Defendant CITY, as the employer of the individual RPD Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

143.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD officers against Plaintiff.

144.     The actions of the RPD officers were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

145.     As a result of the foregoing, Plaintiff suffered injuries and damages.

**FIFTH CLAIM FOR RELIEF**
**Unlawful Seizure / False Arrest**
***Pursuant to 42 U.S.C. § 1983***
**(Plaintiff against REAVES, MAZURKIEWICZ and RPD officers)**

146.     All preceding and subsequent paragraphs are incorporated by reference.

147.     REAVES and other RPD officers had no judicial warrant authorizing them to seize Ms. LYNCH on September 4, 2020.

148.     REAVES, MAZURKIEWICZ and other RPD officers seized Ms. LYNCH, restricting her freedom of movement, without privilege or lawful justification.

149.     Ms. LYNCH was conscious of her confinements by Defendants.

150.     Ms. LYNCH did not consent to being confined by Defendants.

151.     It was unreasonable for REAVES and other RPD officers to believe that they had reasonable or probable cause to seize, detain, or arrest Ms. LYNCH.

152.    REAVES and other RPD officers did not have individualized probable cause to seize, detain, or arrest Ms. LYNCH on September 4, 2020.

153.    REAVES and the other RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

154.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## SIXTH CLAIM FOR RELIEF
### Unlawful Seizure / False Arrest
### *Pursuant to New York State Law*
### (Plaintiff against CITY, REAVES, MAZURKIEWICZ and RPD officers)

155.    All preceding and subsequent paragraphs are incorporated by reference.

156.    One or more of the defendant RPD officers, including but not limited to REAVES and MAZURKIEWICZ, seized, handcuffed and arrested Plaintiff on September 4, 2020.

157.    The arrest was made in the absence of a warrant for the arrest.

158.    The arrest was made in the absence of probable cause for the arrest.

159.    The Defendant RPD officers arrested Plaintiff without having exigent circumstances for doing so.

160.    There was no other authority for the arrest of Plaintiff.

161.    Plaintiff was conscious of the arrest.

162.    Plaintiff did not consent to the arrest.

163.    REAVES and the other RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

164.    The Defendant RPD officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

165.    The Defendant City, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

166.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**SEVENTH CLAIM FOR RELIEF**
**Evidence Fabrication / Denial Of Fair Trial**
***Pursuant to 42 U.S.C. § 1983***
**(Plaintiff against REAVES)**

167.    All preceding and subsequent paragraphs are incorporated by reference.

168.    Defendants deliberately fabricated information in  police reports and other arrest paperwork that they knew was likely to influence a jury's verdict, forwarded that fabricated evidence to prosecutors, and Plaintiff suffered a deprivation of life, liberty or property as a result.

169.    Defendants' actions violated Plaintiff's rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, to due process of law and to a fair trial, and as such, they are liable to plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

170.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to their reputation and standing within the community.

171.    REAVES and the other RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

172.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**EIGHTH CLAIM FOR RELIEF**
**Malicious Prosecution**
***Pursuant to 42 U.S.C. § 1983***
**(Plaintiff against REAVES)**

173.    All preceding and subsequent paragraphs are incorporated by reference.

174.    The RPD Officers, acting individually and in concert, initiated the prosecution of Plaintiff, despite knowing that probable cause did not exist to arrest and prosecute her for any crime.

175.    False and fabricated evidence was given by the RPD officers to the District Attorney's Office.

176.    The RPD officers knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest and prosecute Plaintiff.

177.    There was actual malice and an absence of probable cause for the criminal proceeding against Plaintiff and for each of the charges for which she was prosecuted.

178.    On April 8, 2021, the prosecution terminated in Plaintiff's favor.

179.    As a direct and proximate result of the RPD officers' actions, Plaintiff was wrongly prosecuted for approximately seven months and suffered the other grievous and continuing injuries and damages as set forth above.

180.    REAVES and the other RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

181.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### NINTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

182.    All preceding and subsequent paragraphs are incorporated by reference.

183.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

184.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

185.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

186.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

187.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

188.    Ms. LYNCH's First Amendment Rights were violated, and her speech was curbed and hindered, as a result of being assaulted, battered, subjected to excessive force and falsely arrested by Defendants.

189.    Defendants' unlawful actions towards Ms. LYNCH were motivated by the message she was expressing: calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

190.    Defendants' actions effectively chilled and deterred Ms. LYNCH from exercising her First Amendment Rights, as she was prevented from further protesting on the night of September 4-5, 2020 when she was arrested; and the excessive violence she was subjected to on

the nights of September 4-5 and 5-6, 2020 chilled and deterred her from engaging in future protests, for fear of being subjected to similar unlawful actions by law enforcement.

191.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

192.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF
### Failure To Intervene
### *Pursuant to 42 U.S.C. § 1983*

193.    All preceding and subsequent paragraphs are incorporated by reference.

194.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by the other Defendant RPD officers and Sheriff's Deputies.

195.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

196.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

197.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

198.    Defendant' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

199.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## ELEVENTH CLAIM FOR RELIEF

### Negligent Training, Supervision and Discipline

**(Against BAXTER)**

200.     All preceding and subsequent paragraphs are incorporated by reference.

201.     Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

202.     Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

203.     Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

204.     BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

205.     As a result of the foregoing, Plaintiff suffered injuries and damages.

## TWELFTH CLAIM FOR RELIEF
### Negligent Planning of the Protest Response
### (Against BAXTER)

206.     All preceding and subsequent paragraphs are incorporated by reference.

207.     Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

208.      BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not

violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

209.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

210.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

211.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

212.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

213.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

214.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

215.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

216.   BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

217.     Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

218.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### THIRTEENTH CLAIM FOR RELIEF

**Negligent Planning of the Protest Response**

**(Against the CITY)**

219.   All preceding and subsequent paragraphs are incorporated by reference.

220.     The CITY and RPD were negligent in planning the response to the protests.

221.     The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under First Amendment to the United

States Constitution and Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

222.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

223.    The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under First Amendment to the United States Constitution and Article I, section 8 of the New York State Constitution.

224.    The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively

punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

225.   The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment to the United States Constitution and Article I, section 8 of the New York State Constitution.

226.   The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

227.   The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under First Amendment to the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

228.   The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

229.   The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, such as menstrual irregularities—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

230.   The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

231.   The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

232.   The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

233.   The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

234.   The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

235.   Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

236.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## FOURTEENTH CLAIM FOR RELIEF

### *Supervisory Liability Under 42 U.S.C. § 1983*

**(Against FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, MORABITO and LUCYSHYN)**

237.   All preceding and subsequent paragraphs are incorporated by reference.

238.   As Commander of the SOD of the RPD, FAVOR oversaw the MFF, and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel.

239.   FAVOR personally caused Plaintiff's constitutional injuries by failing to properly train MFF personnel, as described herein; and by failing to appropriately supervise and discipline MFF personnel who violated departmental policy (such as by shooting pepper balls at head level), who engaged in unlawful conduct and/or who violated the rights of Plaintiffs and other protesters.

240.   Favor, Zenelovic, Dearcop and Montinarelli were the Incident Commanders on September 4-5, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

241.   Morabito, Dearcop and Montinarelli were the Incident Commanders on September 5-6, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

242.   Lucyshyn was the Grenadier Team Leader at all times relevant herein. In that role, he chose the various chemical weapons and other "less-lethal" weapons that were used against Plaintiffs and other protesters in September and October, 2020. He also oversaw the training, supervision and discipline of all Grenadier Team members. As such, he was personally involved in causing the injuries sustained by Plaintiffs, as described herein.

243.     Because of the foregoing, Plaintiff sustained, *inter alia*, physical pain, permanent physical injuries, mental injuries, emotional distress, embarrassment, humiliation, loss of standing in the community, adverse employment consequences, loss of liberty, and deprivation of his common law and constitutional rights, and seeks compensation in an amount to be determined at trial.

244.     As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

245.     Defendants committed the foregoing violations of Plaintiffs' rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiffs' constitutional rights or to the effect of such misconduct upon Plaintiffs' constitutional rights.

246.     By reason of the foregoing, the Defendants are liable to Plaintiffs, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.     Empanel a jury;

b.     Award compensatory and punitive damages;

c.     The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.     Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

e.     Such other and further relief as the court may deem just and proper.

Dated: New York, New York
   September 21, 2023

         Respectfully Submitted,

         ROTH & ROTH, LLP.

            ~//S//~

         _____

         Elliot Dolby Shields
         Co-counsel for Plaintiffs
         192 Lexington Avenue, Suite 802
         New York, New York 10024
         (212) 425-1020

         Donald Thompson
         Co-counsel for Plaintiffs
         16 West Main Street, Suite 243
         Rochester, New York 14614
         Ph: (585) 423-8290